STATE OF DELAWARE, Plaintiff, v. JOHN SCOPE, Defendant.

(*January* 4, 1952.)

RICHARDS, P. J., and LAYTON, J., sitting.

*Louis J. Finger*, Deputy Attorney-General, for Plaintiff.

*Anthony F. Emory* for Defendant.

Superior Court for New Castle County, No. 43, March Term, 1951.

LAYTON, J., delivering the opinion:

This defendant was indicted and convicted for a violation of *Vol.* 43, *Chapt.* 239, *Laws of Delaware*, which, insofar as pertinent here, reads: "Whoever * * * exhibits * * * or has in his possession with intent to * * * exhibit, * * * or knowingly advertises * * * any obscene, lewd, lascivious, filthy, indecent * * * drawing, photograph, film, figure or image, * * * is guilty of a misdemeanor".

This chapter is no more than a re-enactment of the English Common Law Offense known as obscene libel which in *Regina v. Hicklin, L. R.* 3; *Q. B.* 360 (*Eng.* 68), was defined as being " * * * whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such

immoral influences and into whose hands a publication of this sort may fall." This test—the effect of the obscene matter on those most susceptible—influenced the thinking of the earlier decisions in this country for many years. *Swearingen v. U. S.*, (1896) 161 *U. S.* 446, 16 *S. Ct.* 562, 40 *L. Ed.* 765; *People v. Muller*, (1884) 96 *N. Y.* 408; *U. S. v. Smith*, (*D. C.*, 1891) 45 *F.* 476. However, censorship, particularly of books, resulting from a rigid application of the principle of *Regina v. Hicklin*, produced unfortunate consequences[1] and, moreover, tended to exclude much valid contemporary literature from being transmitted through the United States mails. Also, works of recognized merit were being banned in Boston and New York where the vice societies were particularly active. As a result, the rule of *Regina v. Hicklin* has gradually been remoulded in order that the benefits of those works of art and science, the dominant tone of which is truth and sincerity in portrayal, might be preserved. Illustrative of the modern rule is *Parmelee v. U. S.*, 72 *App. D. C.* 203, 113 *F.* 2d 729, 736, where it is stated: "The statute involved in the present case was interpreted in *United States v. One Book Entitled Ulysses*, and the decision in that case, is equally applicable here. 'It is settled,' says the court in the *Ulysses* case, 'that works of physiology, medicine, science, and sex instruction are not within the statute, though to some extent and among some persons they may tend to promote lustful thoughts.' It should be equally true of works of sociology, as of physiology, medicine and other sciences—to say nothing of general literature and the arts—that 'where the presentation, when viewed objectively, is sincere, and the erotic matter is not introduced to promote lust and does not furnish the dominant note of the publication', the same immunity should apply."

---

[1]"The foolish judgments of Lord Eldon about one hundred years ago, proscribing the works of Byron and Southey, and the finding by the jury under a charge by Lord Denman that the publication of Shelley's 'Queen Mab' was an indictable offense are a warning to all who have to determine the limits of the field within which authors may exercise themselves." A. Hand, Judge, in *U. S. v. One Book Entitled Ulysses*, (2 *Cir.*) 72 *F.* 2d 705, 708.

Thus, in *U. S. v. Dennett*, (2 *Cir.*) 39 *F.* 2d 564, 565, 76 *A. L. R.* 1092, the Court reversed the conviction of the defendant below, who had been found guilty of publishing an alleged obscene pamphlet entitled "Sex Side of Life" for the reason that it regarded the pamphlet as a sane, sincere and wholesome approach to the subject for adolescents. And in *U. S. v. One Book Entitled Ulysses*, (2 *Cir.*) 72 *F.* 2d 705, 707, the Circuit Court sustained the District Court's dismissal of a libel against James Joyce's "Ulysses" because it concluded that the erotic matter found therein was not introduced "to promote lust" and did not "furnish the dominant note of the publication."

In other words, the emphasis today is placed on whether the alleged offensive work represents dirt for dirt's sake. If not, then the statute is not offended—if so, and if the result tends to arouse the baser passions of the average, not the most susceptible, person, then the statute will be found to have been violated.

It is the admission of the expert testimony to the effect that the film in question would have a deleterious effect sexually upon the minds of adolescents and tend to arouse the baser passions of a normal person, at least in the sub-conscious mind, that is here challenged.[2] There is no doubt but what the earlier

---

[2] "A. From my past experience, I have found that such films are not only detrimental to the youth, but detrimental to any human being who has normal endowments and is not peculiarly psychopathically inclined. It creates a various deviation of thinking and emotional instability in regard to sex problems. A happily married individual who is considered a mature adult individual, seeing such films, becomes seriously concerned with whether he is obtaining the necessary gratification of his sex desires from his normal and normally endowed and inclined wife. It may deviate him in accepting that there is something which arouses him to become interested in an abnormal type of sex satisfaction which he has had perhaps from this picture. So that it is unquestionably seriously detrimental to the adults. As to the juveniles, it is my sincere opinion that we consider very seriously that their normal development of our youth who eventually have to become the backbone of this country and civilization.

"Q. Doctor, will you tell us whether this picture which you witnessed is one which is calculated and designed to excite lustful thoughts and lascivious

authorities excluded expert opinion evidence in cases of this sort. *People v. Muller,* 96 *N. Y.* 408. And respectable modern authority supports the rule, *Commonwealth v. Isenstadt,* 318 *Mass.* 543, 62 *N. E.* 2d 840. The reason for the rule is that "The testimony of experts is not admissible upon matters of judgment within the knowledge and experience of ordinary jury men." *People v. Muller, supra.* On the other hand, the so-called "opinion evidence rule" has been the subject of much criticism. *Wigmore on Evidence, Vol.* 7, *Secs.* 1917-1929. And a number of recent opinions have permitted the introduction of such evidence in cases involving obscenity statutes. *Parmelee v. U. S., supra,* states the reason to be as follows: "with such considerations in mind, perhaps the most useful definition of obscene is that suggested in the case of *U. S. v. Kennerley* [*D. C.,* 209 *F.* 119], *i. e.,* that it indicates 'the present critical point in the compromise between candor and shame at which the community may have arrived here and now.' But when we attempt to locate that critical point in the situation of the present case, we find nothing in the record to guide us except the book itself. The question is a difficult one, as to which the expert opinions of psychologists and sociologists would seem to be helpful if not necessary. Assumptions to the contrary which appear in some of the earlier cases, reveal the profound ignorance of psychology and sociology which prevailed generally, when those opinions were written. More recently, in the cases and textbooks, the desirability and pertinence of such evidence has been suggested. Lacking such assistance in the present case, we can compensate for it in some measure by noticing, judicially, evidence which is thus available to us." See also *People v. Larsen, Sp. Sess.,* 5 *N. Y. S.* 2d 55.

desires and stir the sex impulses of individuals? A. Yes, I am definite on that.

"Q. What would be the percentage of the individual persons who would be stirred into lustful desire? A. I wouldn't go into percentage. I would say that the majority of the normal individuals might have been so.

"Q. Normal individuals, like members of the jury and myself, might become lustfully desiring? A. The majority of people will become so if they don't express so. Sub-consciously they would."

■ But the same considerations which would require the admission of expert evidence in cases such as *Parmelee v. U. S.,* just referred to, cannot be regarded as persuasive here, where the alleged offensive matter was a moving picture of a burlesque show and obviously far removed from the fields of art or science. Hence, the admission of the questioned testimony must be examined in the light of the general rule prohibiting the introduction of expert opinion evidence under circumstances wherein the jury are as well qualified to judge of the matter as an expert. In *Scotton v. Wright,* 14 *Del. Ch.* 124, 122 *A.* 541, 544, former Chancellor Wolcott had occasion to review the rule and said this: "Here the court in the first instance must use its reasonable discretion in determining two things: First, is the subject-matter one that properly falls within the field of expert or special knowledge; and, second, if so, is the witness sufficiently qualified by learning or experience to speak illuminatingly with respect thereto? * * * If, however, the jury are as well qualified by knowledge and experience as the witness to draw the proper inference from these facts, then the witness' opinion should be rejected."

■■ Tested by these standards, we think that there is a reasonable basis for the admission of the expert's opinion that the film in question would tend to have harmful results, at least in the sub-conscious mind, of the average, normal man. The science of psychiatry, while still in its infancy, has made tremendous strides in recent years. Much of it has to do with the workings of the sub-conscious mind about which the average person, obviously knows nothing. If, therefore, it is a fact that the effect of this film might be latent, rather than immediate— that its deleterious effects would linger with probable future undesirable, emotional results not even realized in the conscious mind—then we can see no error in admitting such testimony upon the theory that it would be material and helpful to a jury. However, we doubt if the admission of the evidence as to the effect of the film upon the conscious mind of the normal adult

was correct in view of the prevailing rule just quoted and for somewhat different reasons there would seem to have been error in the admission of the evidence regarding the probable harmful effects of this film upon the minds of adolescents. Had the indictment charged this defendant with exhibiting an indecent film under circumstances wherein it might be reasonably expected that the probable audience would be composed largely of adolescents, the rule of *Regina v. Hicklin* might be evoked— that is to say, the test would then be the effect of the film upon the minds of those most susceptible. *U. S. v. Levine,* (2 *Cir.*) 83 *F.* 2d 156. But as it is, the indictment calls for the application of the rule as to the effect of the film upon the mind of the average, normal man and, strictly speaking, it is doubtful whether the admission of the testimony as to its effect upon adolescents was correct.

■ Nevertheless, although the admission of the testimony regarding the probable effect of the film upon the minds of the normal adult and of the youthful members of the audience may have been error, a new trial would not be granted unless the Court is convinced that the rights of the defendant were thereby prejudiced. As Chancellor Wolcott stated in *Scotton v. Wright, supra*: "If, however, it be conceded that the Superior Court did err in this regard, it does not follow that a new trial should be granted. Even though error may have been committed in rejecting or admitting evidence, yet if the Chancellor is satisfied that such error could have had no prejudicial effect and that the verdict so far as such error could in any way legitimately affect it is nevertheless right, the new trial will be denied. (citations) If the rejected opinion evidence had been received, its probative value in view of all the other facts in the case would have been of so little weight as not to be entitled to influence the jury."

■■ The jury heard the film described and saw it portrayed. It was no more than a complete movie of a low grade burlesque. The so called dances were accompanied by highly

suggestive motions of the body known as "bumps" and "grinds". All the dancers were in a semi-nude state and some of the dances, being strip tease acts, ended with the female performer in a completely naked condition except for the proverbial fig leaf. Interwoven into this dreary scene was the usual low and suggestive comedy dialogue of the alleged comedians. The shocking actions of some of the "teen-age" audience upon emerging from the show were testified to without objection by defendant, thus tending to open the door to some extent for the further evidence of the psychiatrist. Indeed, all the elements of the statutory offense were clearly and monotonously depicted for a period of some two hours. After seeing this film, it would have been surprising had the jury come to any other conclusion than it did despite the testimony objected to. Under all the circumstances and in view of the fact that the charge to the jury correctly defined the offense[3], the error, if any, in admitting this testimony was not, in our judgment, prejudicial.

There remains to be considered defendant's assignment of error concerning our refusal to admit into evidence certain suggestive pictures of semi-nude women appearing in advertisements or otherwise, in magazines of national circulation. It is argued that such matters was material to the issue here in that it demonstrates the tolerant attitude of the public in general regarding such portrayals and the consequent unlikelihood that this film would have a harmful effect upon the normal man, accustomed to seeing such pictures on every side. We cannot agree. The defendant here is on trial. Whether or not the publishers of magazines are so conducting their business as to offend the statute is not part of this inquiry and is not material to the

---

[3]A motion picture is obscene, lewd, lascivious, filthy, indecent, within the meaning of the statute when the language, sounds and actions therein are offensive to the common sense of decency and modesty of the community, and when the dominant theme of the motion picture, considered as a whole, is calculated to and is likely to excite lustful thoughts and lecherous desires or to stir the sex impulses or to lead to sexually impure thoughts in the ordinary average person who is likely to see the film.

issue here. *Commonwealth v. Donaducy*, 167 *Pa. Super.* 611, 76 *A.* 2d 440; *State v. Ulsemer*, 24 *Wash.* 657, 64 *P.* 800. This evidence was properly excluded.

The motion for a new trial is denied.