4 N.Y.2d 349 (1958)
In the Matter of Kingsley International Pictures Corporation, Respondent,
v.
Regents of the University of the State of New York, Appellant.
Court of Appeals of the State of New York.
Argued January 7, 1958.
Decided May 15, 1958.
Charles A. Brind, Jr., John P. Jehu, Elizabeth M. Eastman and George B. Farrington for appellants.
Louis J. Lefkowitz, Attorney-General (Ruth Kessler Toch and Paxton Blair of counsel), for appellants.
Ephraim S. London and Stephen A. Wise for respondent.
Judges FROESSEL and BURKE concur with Chief Judge CONWAY; Judge DESMOND concurs in result in a separate opinion; Judges DYE and FULD dissent and vote to affirm, each in a separate opinion in which the other concurs and in both of which dissenting opinions Judge VAN VOORHIS concurs in part in a separate dissenting opinion for remission of the matter to the Board of Regents.
*351 Chief Judge CONWAY.
This case presents us again with the question of the constitutionality of our motion picture licensing law. Undoubtedly this is often a question of the greatest delicacy. But as we ponder this particular case and what is involved here, we perceive no necessity for apprehension as to the justice or constitutionality of the Board of Regents' determination to deny a license to this film, "Lady Chatterley's Lover". This denial was based upon sections 122 and 122-a of the Education Law which require the denial of a license to motion pictures which are immoral in that they portray "acts of sexual immorality * * * as desirable, acceptable or proper patterns of behavior." It is this portion of the statute only which concerns us here. The vileness of the matter it seeks to reject is clear. It embraces not only films which are visually suggestive and obscene, nor only those which are sexually suggestive and immoral in theme, but those which combine the two. The statutory rejection is aimed at those *352 films which, not being satisfied with portraying scenes of rank obscenity, go further and recommend sexually immoral acts, thus portrayed in a manner appealing to the prurient interest, as proper conduct for the people of our State.
Having clarified the substance of what this case involves, we proceed to a consideration of the several issues raised. And we approach them with confidence in our Legislature, concern for our people, and a firm conviction of our solemn constitutional duty which requires us not only to protect the individual from oppressions of government, but the government and the people from abuses by the individual.
This film deals with the relationships of Lady Chatterley with her husband, Sir Clifford Chatterley, and her lover, Mellors. Sir Clifford returned to his wife from the wars as a cripple doomed to a life in a wheelchair. His war injury rendered him impotent to father offspring. By the standards of the community in which he lived, he was a man of affluence, owning a mine and extensive lands. His status was comparable to that of a feudal lord, and much like a feudal lord he was gravely concerned over the fact that he neither had, nor would have, an heir. This led him to propose to his wife, Lady Chatterley, that she have sexual relations with another man of her own choosing so that she might bear an heir for Sir Clifford. Lady Chatterley appeared to reject this idea, inquiring of her husband whether he still loved her, and whether it would be wise to do such a thing since the possibility existed that she might fall in love with the man to whom she would give her body. Sir Clifford explained that his desire for her to have a child was the highest possible expression of his love, and he pointed out that another love could not be born of the purely physical relationship which he anticipated she would have with such a man. No more was said, and Lady Chatterley left her husband's bedroom in which they had been talking.
Subsequently, Lady Chatterley's sister suggested that she take a vacation from the arduous task of caring for her crippled husband. The city of Venice was suggested, and Sir Clifford heartily indorsed this idea, thinking that such a trip would provide his wife with the ideal circumstances for choosing a lover and committing adultery with him.
*353 Before going to Venice, Lady Chatterley made the acquaintance of Mellors, Sir Clifford's gamekeeper. Mellors was a married man, but was living apart from his wife. It was not long before Lady Chatterley and Mellors indulged in adultery. Scenes of their passion were portrayed. Their affaire, climaxed by the pregnancy of Lady Chatterley, was unfolded through a series of clandestine bedroom scenes during which the two were shown lying in bed in a state of apparent undress before, and again after, acts of adultery; during which Mellors assisted Lady Chatterley in her preparations for the sexual act by unbuttoning her blouse and unzipping her dress; during which Mellors expressed his passion by caressing her buttocks, after reaching with his hand under her dress, noting that she had obligingly come to him clad only in a dress, without undergarments; during which numerous other words, gestures and motions were employed to provide the atmosphere prefatory and subsequent to acts of adultery; and during which, at Lady Chatterley's instigation, Mellors removed from the wall above the mantle piece in his living room a large framed picture of his wife and destroyed both frame and picture. The scenes were set, interrupted only by brief canvasses of darkness, upon which the imagination was permitted to complete the picture of illicit sexual love. Out of these intimacies was born a "love" between Lady Chatterley and her lover Mellors which each regarded as binding them in a true marriage, although not a marriage solemnized by church or state, and although their respective spouses were living.
Events followed quickly on the heels of Lady Chatterley's pregnancy  her trip to Venice, Mellors' dismissal by Sir Clifford because of scandalous "rumors" regarding the two, and her return to the manor. When she returned, Mellors was packing his things in preparation for his departure from the estate. She went first to Mellors to profess her love and to tell him that she would forsake her husband, her wealth and her position to live with him. She then went to her husband to admit the truth of the "rumor" and to tell him of her decision to live with Mellors. Sir Clifford refused to agree to a divorce and insisted that he be given the child when it should be born. Lady Chatterley rejected that and returned to Mellors. *354 The curtain falls as Lady Chatterley and her lover leave his abode for what apparently was regarded by their neighbors who witnessed it from their porches and doorways as a life of illicit intimacy. We make brief mention also of another scene in which Mellors' wife apparently indulges in an act of intercourse with another man beside a body of water.
The dominant theme of the film may be summed up in a few words  exaltation of illicit sexual love in derogation of the restraints of marriage. Their relationship was presented as a true marriage. Their complete surrender to the baser instincts was presented as a triumph over the social mores. Their decision to live in adultery was quietly heralded as a conquest of love over the "form" of marriage. And this entire theme was woven about scenes which unmistakably suggested and showed acts of sexual immorality.
That such is the theme of this motion picture is not open to doubt, particularly in light of respondent's own statement in its brief that the principal theme is that a true marriage exists where there is love, "not when there is merely a formal relationship sanctioned by law." And indeed, in its petition to the Board of Regents, respondent stated that "[h]er [Lady Chatterley's] relationship with Mellors, although not sanctioned by law, is portrayed as a true marriage." Thus, this film unquestionably presents adultery as a proper pattern of behavior. And it does so employing several scenes of obscenity.
However, respondent suggests that the film is nevertheless not immoral according to the mores and moral standards of the community. We think it is beyond cavil that the moral standards and mores of the people of the State of New York (indeed, of our nation) brand adultery as immoral and illegal. The relationship between Lady Chatterley and Mellors was precisely that  adultery. To urge that such conduct is not immoral constitutes a confession of values so condemnable as not to warrant further comment. The determination by the Board of Regents, a constitutional body, that this picture is utterly immoral in its theme, and that it presented adultery as proper behavior, was entirely correct as measured by the standards of our community. But beyond that, the Legislature specifically designated such a motion picture as immoral, and the determination by the Regents was mandated by statute, *355 Indeed, adultery has been decreed to be immoral since Moses received the Commandments on Mount Sinai. Any suggestion that this film merely demonstrates the necessity for love in marriage insults a concept of the profoundest nobility, and fails to recognize the clear and familiar distinction between licit and illicit love. To urge that this motion picture merely points up the necessity for love in marriage ignores the facts and the story  the whole context.
It is next urged that this statute is unconstitutionally vague and indefinite. The United States Supreme Court has established the necessary principle that motion picture licensing may be conducted only pursuant to a statute which is so clear in its terms that the licensor is furnished with a definite standard which he may apply (Joseph Burstyn, Inc., v. Wilson, 343 U. S. 495, 504-505; see, also, Superior Films v. Department of Educ. of Ohio and Commercial Pictures Corp. v. Board of Regents, 346 U. S. 587). The purpose underlying this principle is to divest the licensor of unlimited restraining power based upon his own judgment of what shall or shall not be licensed  to avoid what may be denominated as discretionary censorship. The standard under consideration here is as explicit and restrictive in its terms as words permit. Our Legislature through section 122-a requires the denial of a license to any motion picture which portrays acts of sexual immorality (here adultery) as proper behavior. No one will deny that the Regents of New York State, just as the members of this court, know what an act of sexual immorality is, and that adultery is such an act. This standard leaves no area of judgment or speculation open to the Regents in which they might arrive at personal judgments as to what constitutes immorality. Their sole function under the statute is the fact-finding function as to whether a particular motion picture portrays acts of sexual immorality as proper behavior. If it does, it is ipso facto immoral by statutory mandate. To hold that this standard is vague or indefinite would be to hold that the requirement of definiteness expounded in the Burstyn case is impossible to satisfy.
It should be noted that section 122-a was enacted by our Legislature in 1954 in an attempt to comply with the decision without opinion of the United States Supreme Court in the *356 Commercial Pictures case (supra). When that case was decided, there was no statutory definition whatever of the word "immoral." We held, in rather general terms, as distinguished from the customary specificity of statutes, that the word "immoral" related to "standards of sexual morality" (Matter of Commercial Pictures Corp. v. Board of Regents, 305 N.Y. 336, 346). On appeal to the United States Supreme Court, our decision was reversed without opinion on the authority of the Burstyn case (supra) which held only, by express limitation in that opinion, that the word "sacrilegious" is too vague and indefinite. The portion of section 122-a which we are considering here, for the first time, defines the word "immoral" much more explicitly than this court construed it in Commercial Pictures. Thus, while we reach our conclusion that this standard is definite independently of Commercial Pictures, it may be pointed out that our decision there also leads to this result. Furthermore, the reversal without opinion by the Supreme Court in that case cannot be deemed to be dispositive of the new, different, and more explicit language employed in section 122-a as it applies here.
Respondent next argues that expression of opinion may not be suppressed in the absence of a showing of clear and present danger of substantive evil to the community. It should first be emphasized that the scope of section 122-a is not mere expression of opinion in the form, for example, of a filmed lecture whose subject matter is the espousal of adultery. We reiterate that this case involves the espousal of sexually immoral acts (here adultery) plus actual scenes of a suggestive and obscene nature. The question, then, is whether such a motion picture must be shown to present a clear and present danger of substantive evil to the community.
Respondent's argument fails to recognize the evil and danger to society which inheres in expressions which debase fundamental sexual morality by portraying its converse to the people as alluring and desirable. Such expression has been universally and traditionally condemned by our national society  its inherent evil dependent not at all on the times. It is the very nature and function of such expression to corrupt the public morals. The United States Supreme Court has said that the prevention and punishment of such expression has "never been *357 thought to raise any Constitutional problem", and that "such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (Chaplinsky v. New Hampshire, 315 U. S. 568, 571-572; see, also, Beauharnais v. Illinois, 343 U. S. 250, 256, 257; emphasis added.) Thus, in Roth v. United States (354 U. S. 476), it was held that "obscenity is not protected speech" and that, therefore, there is no need to consider whether "obscene material will perceptibly create a clear and present danger of antisocial conduct" (p. 486). It was noted that obscenity has always been rejected as utterly without redeeming social importance (p. 484). But obscenity is only one word which, among others, signifies "that form of immorality which has relation to sexual impurity" (Swearingen v. United States, 161 U. S. 446, 451). All these words  indecent, immoral, obscene, lewd, lascivious, etc.  refer to the same substantive evil, viz., sexual impurity and immorality. (See Swearingen v. United States, supra; Matter of Excelsior Pictures Corp. v. Regents, 3 N Y 2d 237, 243; People v. Winters, 294 N.Y. 545, 550, revd. on other grounds, 333 U. S. 507; People v. Muller, 96 N.Y. 408.) Their definitions in legal dictionaries reveal they are used interchangeably. They have the same meaning as in common-law prosecutions for obscene libel (Swearingen v. United States, supra, p. 451; Matter of Dampier, 46 Idaho 195; State v. Scope, 46 Del. 519), which embraced any writings, pictures or the like "of an immoral or an illegal tendency" (4 Blackstone's Comm., p. 150), and "such indecent or immoral publications as tend to destroy the love of purity, morality and virtue, and corrupt the public morals." (Chase, Blackstone's Comm., p. 916, n. 3; see Rex v. Curl, 2 Str. 788, 93 Eng. Rep. 849). At common law every public show and exhibition which was contrary to good morals was indictable (1 Bishop on Criminal Law, § 504). And so, "freedom of speech * * * does not permit the publication of * * * indecent articles, or other publications injurious to public morals * * *." (Robertson v. Baldwin, 165 U. S. 275, 281.)
Our conclusion, therefore, is the same as that of the United States Supreme Court in the Roth case (supra). It is unnecessary *358 to consider whether a motion picture which alluringly portrays sexually immoral acts as proper behavior does, in fact, present a clear and present danger of substantive evil to the community, if indeed such could reasonably be doubted. There is no difference in substance between motion pictures which are corruptive of the public morals, and sexually suggestive, because of a predominance of suggestive scenes, and those which achieve precisely the same effect by presenting only several such scenes in a clearly approbatory manner throughout the course of the film. The law is concerned with effect, not merely with but one means of producing it. We do not believe that a film which is rank pornography is objectionable simply because it excites a human appetite. Rather, the objection lies in the corrosive effect upon the public sense of sexual morality. The principle which has always prompted the rejection of obscenity is the "social interest in order and morality." (Chaplinsky v. New Hampshire, 315 U. S. 568, 571-572, supra; Beauharnais v. Illinois, 343 U. S. 250, 256, 257, supra).
Essentially, then, the question amounts to this: What can society do about protecting itself from motion pictures which are corruptive of the public morals? We hold that it may refuse to license a motion picture which alluringly portrays adultery as proper behavior. We so hold with full confidence that our Founding Fathers never intended that our Federal Constitution be the altar upon which this State, and this nation, must sacrifice themselves to the ravages of moral corruption. Our Constitution is a document for government, not a tool for anarchy or a license for corruption.
Our holding that a license may constitutionally be denied under the circumstances presented here is well supported in principle by our prior decisions (see Matter of Excelsior Pictures Corp. v. Regents, supra; Matter of Commercial Pictures Corp. v. Board of Regents, supra). We noted in Excelsior that sexual immorality is the only legal basis for censorship, keeping in mind that the licensing statute must be very clear. While we noted in Excelsior (supra, p. 240) that "[w]e will not * * * quibble or quarrel as to concepts of decorum or delicacy or manners", it would seem unnecessary to stress that adultery is not a mere matter of etiquette. Moreover, we view the several decisions of the Supreme Court as indicating the *359 validity of motion picture licensing directed against sexual immorality provided the licensing statute clearly delineates the standard which the licensors are to apply. (See Commercial Pictures Corp. v. Board of Regents, supra; Superior Films v. Department of Educ. of Ohio, supra; Joseph Burstyn, Inc., v. Wilson, supra.) We would be content to rest our decision upon this precedent were it not that the dearth of authoritative opinions leaves the law of motion picture licensing in a state of some uncertainty. Hence, we proceed to further discussion.
Strictly from a pragmatic standpoint, public morality is essential to a civilized society. "History bears witness to the fate of peoples who have been indifferent to the vice of indiscriminate sexual immorality  a most serious threat to the family, the home and the State." (Matter of Commercial Pictures Corp. v. Board of Regents, 305 N.Y. 336, 342, supra.) "The destruction of morality renders the power of the government invalid, for government is no more than public order. It weakens the bands by which society is kept together." (Commonwealth v. Sharpless, 2 Serg. & Rawl. 91, 103 [Pa., 1815].) Thus, it has always been true that the preservation of public morality is a proper subject for the exercise of the police power. And the Constitutional right freely to express one's thoughts has never been thought to divest society of its right and duty to preserve fundamental public sexual morality. (Chaplinsky v. New Hampshire, supra, pp. 571-572.) Thus, sexually impure utterances tending to corrupt the public morals have always been criminally punishable. Very recently, the United States Supreme Court sustained the injunctive process as a perfectly constitutional remedy whereby a State may protect its people from the evil effects of obscene books. (Kingsley Books v. Brown, 354 U. S. 436.) The Kingsley case has put to rest the claim that no prior restraint is constitutionally permissible. That court said: "The phrase `prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test." (P. 441.) Stress was laid on the fact that upon the courts falls the duty of close analysis and a pragmatic assessment of the operation of the statute under particular circumstances. We apply these thoughts also to the remedy of motion picture licensing.
We do not regard the word "censorship" as a self-wielding sword and we reject it as a talismanic test. Whatever may be *360 the constitutional inhibition against the licensing of books, which were a communicative medium familiar to our forefathers, we cannot conclude that motion pictures must be regulated in precisely the same fashion. It has been observed that "[t]he various forms of modern so-called `mass communications' raise issues that were not implied in the means of communication known or contemplated by Franklin and Jefferson and Madison. * * * Movies have created problems not presented by the circulation of books, pamphlets, or newspapers * * *." (Kovacs v. Cooper, 336 U. S. 77, 96.) And thus, the Supreme Court declared six years ago, when it first held motion pictures to be within the general protection of the First and Fourteenth Amendments, that:
"To hold that liberty of expression by means of motion pictures is guaranteed by the First and Fourteenth Amendments, however, is not the end of our problem. It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places. * * * Nor does it follow that motion pictures are necessarily subject to the precise rules governing any other particular method of expression. Each method tends to present its own peculiar problems." (Joseph Burstyn, Inc., v. Wilson, supra, pp. 502-503; emphasis added.)
A contention that motion pictures must be subject to only the same type of regulation as books is "sterile argumentation [which] treats society as though it consisted of bloodless categories" (Kovacs v. Cooper, supra, p. 96). The greater capacity for evil which inheres in motion pictures has been recognized by the highest Federal tribunal as "relevant in determining the permissible scope of community control" (Joseph Burstyn, Inc., v. Wilson, supra, p. 502). We heed the warning of Justice HOLMES that "`[t]o rest upon a formula is a slumber that, prolonged, means death'", and we obey the admonition of Justice FRANKFURTER, as he pondered this thought, against "mechanical jurisprudence through the use of oversimplified formulas." (Kovacs v. Cooper, supra, p. 96.) "The tyranny of labels * * * must not lead us to leap to a conclusion that a word which in one set of facts may stand for oppression or enormity is of like effect in every other." (Palko v. Connecticut, 302 U. S. 319, 323.) To deny the remedy *361 of licensing as against motion pictures under circumstances such as those disclosed here would be to ignore the spirit and purpose of our Federal Constitution which has always been deemed to permit society to employ remedies which are adequate to protect itself from corruption of public sexual morality. Law, particularly constitutional law, is the means whereby society is preserved and held intact. Catch phrases such as "no movie licensing" do nothing to subserve that end. We are molding constitutional justice, and have no interest in perpetuating as a motto a concept which was valid as intended and as applied, in past history, but not as some seek to extend it today in total disregard of the progress of civilization and the consequences of change, both good and evil. The constitutionality of this statute must be assessed pragmatically in terms of its necessity to society in exercising its vital and recognized right to preserve the public morality.
In considering the question of motion picture licensing, this court has pointed out that "[n]o other method will afford reasonably adequate protection to the public." (Matter of Commercial Pictures Corp. v. Board of Regents, supra, pp. 343, 351.) We are not concerned here with licensing books, pamphlets, newspapers, etc., the traditional media of expression. Moving pictures are our only concern and, what is more to the point, only those motion pictures which alluringly present acts of sexual immorality as proper behavior. This is not a case of a book on a shelf or in a home  it is a case of mass dissemination of approved illicit sex by the spoken word and a visual art. It is a case not of one showing but hundreds of showings. It is a case not of an audience of one, but audiences of hundreds  in some cases thousands  at each showing. It is a case not merely of a theme of words, but a theme woven about scenes clearly portraying and suggesting acts of adultery. Bearing in mind the broad scope of motion picture presentation, how may society effectively discharge its responsibility to protect itself from morally corruptive films. After all, we are dealing only with a question of remedy  there is no question as to the evil which is the subject of the remedy. Not even the injunctive process, already recognized as constitutionally permissible against obscene books, is adequate unless the theory is to be that the public morality may be corrupted from the first showing *362 of the film until it is detected and finally enjoined. We can take little consolation from whatever brevity there may be in such a period of time, notwithstanding the possibility of injunctions pendente lite, when one considers the saturation techniques employed by the motion picture industry which presents numerous showings at one and the same time, with several showings per day in each theatre. And beyond that, we take note of the possible multiplication of this mass presentation by means of television. There can be little doubt that the only effective remedy which society possesses lies in a system of motion picture licensing which will operate adversely only to motion pictures which are corruptive of public morality. The substantive evil of the expression considered in light of the medium in issue make this a necessary and constitutional policy. To hold otherwise would be a "decision of desperation" (Poulos v. New Hampshire, 345 U. S. 395, 408)  a confession that our State is helpless to prevent the corruption of public morals, a duty which it has assumed from time immemorial. We do not believe this is a confession which this court is required to make.
Analyzing this statute still further, we note that full judicial review under article 78 of the Civil Practice Act is available as a matter of right from any and every adverse determination by the Board of Regents (Education Law, § 124). Fully appreciative of the preferred position of the constitutional guarantee of free expression, the courts of this State will always be alert to excesses and most quick to correct them, as indeed we were recently in the Excelsior case (supra). We note further that "* * * this sovereign State put the licensing power in one of its most powerful and most respected governmental bodies, the Board of Regents, a `citizens' board' which is at the head of the State's educational system. Censorship in New York is, therefore, carried on at the highest levels of responsible State Government." (Matter of Commercial Pictures Corp. v. Board of Regents, 305 N.Y. 336, 350, supra.) Thus safeguarded, the operation of this statute is simply to protect the citizens of our State from motion pictures which alluringly portray acts of sexual immorality (here adultery) and recommend them as a proper way of life. No other remedy will accomplish this result. Considering all of the foregoing, *363 our judgment is that this statute insofar as it is involved here survives the test of close analysis and pragmatic assessment laid down by the highest Federal tribunal in the Kingsley case (supra).
It is fundamental that each sovereign State has, under the Federal Constitution, the primary responsibility for the preservation of the basic morality of its people. Of course, it is equally fundamental that the State must discharge that responsibility without undue infringement upon individual liberty. But the distinction between liberty and license must be made. We fail to perceive what right is infringed here. The Constitution of the United States, "that great ordinance of government and orderly liberty", is invoked to protect the mass dissemination of approved sexual immorality by adultery in motion pictures from the only effective remedy which society possesses. (See Schaefer v. United States, 251 U. S. 466, 477; italics supplied.) In the name of liberty we are requested to confer license to corrupt. "It would be a travesty on the constitutional privilege he invokes to assign him its protection." (Gilbert v. Minnesota, 254 U. S. 325, 333.)
Only the State, close to the problems of its people, can fully appreciate them. We are disturbed by the increasing marks of moral laxity. Sex crimes occur daily. Advertising appeals more and more to the sexual appetite. Sexual immorality and obscenity appear in books, pamphlets, voice recordings, motion pictures, photographs, prints, and in every other form which the imagination of those bent upon immorality and filth can devise. Sadly enough, we could go on. But this much is sufficient to demonstrate that our public morality, possibly more than ever before, needs every protection which government can give. We are unable to look upon moral disintegration as a mere change in custom. We reiterate that "[t]he destruction of morality renders the power of the government invalid, for government is no more than public order * * *." (Commonwealth v. Sharpless, supra, p. 103.)
There would seem to be little difficulty for most to accept sheer obscenity as a proper basis for motion picture censorship. However, to lay hold of obscenity as the only proper basis for motion picture censorship is to ignore substance in favor of form. As we noted earlier in discussing the question of clear *364 and present danger, obscenity has been universally and traditionally rejected because it is destructive of the public morality. In view of this, it is curious indeed to say in one breath, as some do, that obscene motion pictures may be censored, and then in another breath that motion pictures which alluringly portray adultery as proper and desirable may not be censored. As stated above, "The law is concerned with effect, not merely with but one means of producing it." It must be firmly borne in mind that to give obscenity, as defined, the stature of the only constitutional limitation is to extend an invitation to corrupt the public morals by methods of presentation which craft will insure do not fall squarely within the definition of that term. Precedent, just as sound principle, will not support a statement that motion pictures must be "out and out" obscene before they may be censored. Roth v. United States (354 U. S. 476, supra) did not involve motion pictures, much less their licensing. It merely held that obscenity is not protected speech and in the case of an obscene book it is not necessary to establish clear and present danger of substantive evil to the community. In sum, the Supreme Court has never outlined the substantive limits of motion picture censorship. To claim otherwise is to supplant reality with hope, and replace law with theory.
We refuse to be led away by alarmist cries that, if a license is refused under the circumstances disclosed by this record, the door is opened to unnecessary and unwarranted extensions of that remedy. The very test of necessity which we have utilized precludes that possibility. And we have already declared it to be our most solemn constitutional duty to "`eschew the extremes and shun the extremists'". (Matter of Excelsior Pictures Corp. v. Regents, supra, p. 246.) There is nothing extreme about refusing a license to films which alluringly portray acts of sexual immorality by adultery as proper behavior. To withhold our approval from this amount of regulation would itself be an extreme. To those who fear possible unnecessary extensions of this remedy, we reply that this court is competent to define the permissible scope of motion picture licensing and to safeguard constitutional liberties.
It is not aside from the issue to ponder, for a moment, the fact that this State and this nation have always been dedicated to the observance of fundamental morality. Indeed, when we *365 declared our independence from the yoke of tyranny, we conceived that the unalienable liberties of men, one of which is free expression, are endowed "by their Creator". And in the same document, as they embarked upon the cause of freedom, its drawers expressed "a firm reliance on the protection of Divine Providence". After the cause was won, the Congress observed that "morality" is "necessary to good government". (Ordinance of 1787, art. III; McKinney's Cons. Laws of N. Y., Book 2, Constitution, pt. 2, p. 527.) Lest anyone claim that almost two centuries have worked a contrary view in this nation, let him reflect upon the recent words of the United States Supreme Court: "We are a religious people whose institutions presuppose a Supreme Being." (Zorach v. Clauson, 343 U. S. 306, 313.) And let him consider also the fact that the Pledge of Allegiance was recently altered so that it declares this nation to be one "under God." We can think of no greater national hypocrisy, or perversion of our Constitution, than to say that that document renders society impotent to adopt the only adequate remedy against motion pictures which are corruptive of the public morality. Indeed, it is necessary for our survival as a nation in an age of open conflict with atheistic materialism.
This case presents not only a question of law. It presents a matter of governmental conscience for which we are all responsible. We perceive no requirement in our Constitution that prohibits us from concluding as we have. If our people must be exposed to mass sexual immorality, if the very fabric of our society is to be laid bare to such corrosive influences, it must be at the command of our people themselves. Their command, however, has been to the contrary by virtue of this enactment. We think their decision is supported by their Constitution.
No other issues are raised which require discussion.
The order of the Appellate Division should be reversed, with costs in this court and in the Appellate Division, and the determination of the Board of Regents confirmed.
DESMOND, J. (concurring).
Appellants, the State Board of Regents, have banned the motion picture "Lady Chatterley's Lover" as being "immoral" within the special definition of that word in subdivision 1 of section 122-a of the Education Law, that is, as being a film "which portrays acts of sexual *366 immorality * * * or lewdness" and which "presents such acts as desirable, acceptable or proper patterns of behavior". Since the theme and content of this film fairly deserve that characterization, the Regents acted within their express statutory powers in refusing to license it for exhibition. That, however, does not decide this lawsuit.
The question for decision is the one that has troubled our court and other State courts as well as the United States Supreme Court in a long series of litigations (from Mutual Film Co. v. Ohio Ind. Comm., 236 U. S. 230 [1915], to Times Film Corp. v. City of Chicago, 355 U. S. 35 [1957]) involving State or municipal censorship of movies. Our problem is whether this statute insofar as it imposes prior restraint on the showing of this film in New York State offends against the free speech guarantee of the First and Fourteenth Amendments to the United States Constitution. In arriving at our answer we must perform a double duty. We must abide by the decisions of the supreme Federal judicial tribunal so far as pertinent and at the same time we must be reluctant to strike down a solemn legislative enactment on the ground of unconstitutionality, for that we may do "only as a last resort" (Matter of Ahern v. South Buffalo Ry. Co., 303 N.Y. 545, 555). I am voting to reverse here and to uphold this denial of a license because this New York statutory definition of "immoral" carefully and quite recently devised by chapter 620 of the Laws of 1954 to meet constitutional objections (see Matter of Commercial Pictures Corp. v. Board of Regents, 305 N.Y. 336, revd. 346 U. S. 587) to the use of such wide or vague terms as "immoral" and "tend to corrupt morals", is not patently unconstitutional. Furthermore, neither it nor any other State statute closely resembling it has been held invalid by the Supreme Court.
Of course if we had here (as in Brown v. Kingsley Books, 1 N Y 2d 177, affd. 354 U. S. 436) a case of hard core out-and-out pornography, our task would be simple enough. In Joseph Burstyn, Inc., v. Wilson (343 U. S. 495, 502) the Supreme Court rejected the absolutist idea that "The Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places". And, more specifically, in Roth v. United States (354 U. S. 476  a criminal prosecution) the court flatly announced that "obscenity is not within the area of *367 constitutionally protected speech" (p. 485, and see our similar holding in Matter of Excelsior Pictures Corp. v. Regents, 3 N Y 2d 237). "Obscene material", the Supreme Court told us in Roth (supra, p. 487), is "material which deals with sex in a manner appealing to prurient interest". But "prurient interest" is subjective and various. The movie we are here dealing with, while it has for its main or only theme illicit sexual congress, is a film version of a novel of great fame by an eminent author and, says the Supreme Court, "The portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional freedom of speech and press" (Roth opinion, p. 487). The old Hicklin (Regina v. Hicklin, L. R. 3 Q. B. 360) test which examined into the publication's effect on "particularly susceptible persons" has been finally rejected (Roth opinion, p. 489). Now given the Supreme Court's approval is this test for obscenity: "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest" (Roth opinion, p. 489). That criterion is roughly the same as the one presented in Butler v. Michigan (352 U. S. 380, 382), that is, the influence of the product on a normal adult. I confess my own inability to determine whether or not an average person, applying to "Lady Chatterley's Lover" the undiscoverable standards of a hypothetical community would consider that the dominant theme of the whole film appealed principally to prurient interest or to artistic sensibilities or to a mature and adult interest in one of the lively arts. But one sure result of the Roth decision was to disappoint both the extreme liberals who had hoped to spread the First Amendment's blanket over all speech whether obscene or not, and the extremists at the other end who despite the pluralist character of our society would make of the law a policeman enforcing their own ideas of morality and propriety.
Helpful as are the Roth decision's explanations of the constitutional limits of speech and press freedom (and see, also, Alberts v. California, 354 U. S. 476, and Kingsley Books v. Brown, 354 U. S. 436, decided by the court on the same day), there are still large areas of uncertainty. The publications which were the subject matter of Roth, Alberts and Kingsley *368 were actually pornographic and salacious, utterly lacking in "social importance" or value (Roth opinion, p. 484). So the Supreme Court was really passing only on the general constitutionality of State action against obscenity without finding it necessary to set down precise criteria for deciding whether a particular book or picture is obscene. It still remains true that the highest Federal court has never yet upheld any single instance of administrative censorship of a motion picture.
In the Excelsior Pictures case (3 N Y 2d 237, supra) our own court overruled the Regents' restraint of a nudist movie since the majority of this court considered the picture innocent and innocuous, merely unconventional in that it pictured activities of unclothed family groups in a secluded camp. In January of this year (Sunshine Book v. Summerfield, 355 U. S. 372) the Supreme Court, with no explanation beyond a reference to the Roth case (supra), held invalid the exclusion from the mails of a nudist magazine (also a magazine dealing with homosexuality  One, Inc., v. Olesen, 355 U. S. 371). Presumably, the court having looked at those books simply held them not to be obscene. A few months earlier the court in Times Film Corp. v. City of Chicago (355 U. S. 35, supra) reversed a ban by the Chicago authorities on the French moving picture "Game of Love". That picture was from all accounts sexy in the extreme (see descriptions in the lower court opinions at 139 F.Supp. 837 and 244 F.2d 432) and it had been denied exhibition under an ordinance condemning movies "immoral or obscene".
All this recent history suggests that the Supreme Court will insist that censorship for obscenity be "closely confined" (Kingsley Books v. Brown, 354 U. S. 436, 441, supra) especially as applied to works of any literary or dramatic merit or expressing "ideas having even the slightest redeeming social importance  unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion" (Roth opinion, p. 484, supra). Similarly, our own State Constitution says that: "every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right". But we are still left with our own stern duty of upholding, if we can on reason and authority, our own State's statute.
*369 It is of no great importance that the Regents in denying a license here did not use the word "obscene" nor is it necessarily determinative that this film is not obscene in the dictionary sense of being lewd, disgusting or loathsome or dealing directly and foully with the excretory or sexual organs or functions. Our question is whether New York State may constitutionally refuse exhibition to a film because its subject matter is adultery presented as being right and desirable for certain people under certain circumstances. I confess doubt as to the validity of such a statute but I do not know how that doubt can be resolved unless we reverse here and let the Supreme Court have the final say. Unquestionably, this motion picture would be considered obscene by many not illiberal moralists as objectively evidencing an intent by the author to arouse the viewer by emphasizing the sexually exciting elements of the story, a concept of obscenity not unlike the classic definition in United States v. One Book Called "Ulysses" (5 F.Supp. 182, 184; see my article, Legal Problems Involved in Censoring the Media of Mass Communication, in 40 Marquette L. Rev. 38, 55-56).
It still remains that the States have large remaining powers to apply reasonably related remedies to domestic evils (see Butler v. Michigan, 352 U. S. 380, 383, supra). The problem is not one of precise definition of "prior restraint" or "obscenity" or other word or phrase. A leading authority on legislation says that "the question should be not one of standards but rather whether censorship should be permitted in the particular case regardless of the wording" (Control of Objectionable Publications  A Drafting Problem, 44 A. B. A. J. 175). To be examined is "the operation and effect of the statute in substance" (Near v. Minnesota, 283 U. S. 697, 713; Kingsley Books v. Brown, 354 U. S. 436, 441, supra). The "operation and effect" of subdivision 1 of section 122-a of our Education Law in this instance has been to keep from the screen a motion picture the theme of which is adultery, alluringly and approvingly depicted. Until the highest national tribunal says otherwise, we should let our statute so operate.
The order should be reversed, with costs in this court and in the Appellate Division, and the determination of the Board of Regents confirmed.
*370 DYE, J. (dissenting).
When sections 122 and 122-a of the Education Law are read in the light of recent decisions dealing with administrative censorship of motion picture film, it seems clear that the learned Appellate Division, Third Department, quite properly annulled the determination of the Board of Regents and directed that a license issue for the showing of the motion picture entitled "Lady Chatterley's Lover".
As the record indicates, the Regents sitting as a Board of Review of its Division of Motion Pictures (an administrative agency empowered to censor motion picture film in advance of public showing, Education Law, §§ 122-132) affirmed a denial of the petitioner's application for a license to exhibit the film in question  not conditionally, unless certain designated sequences were deleted, as directed by the acting director of the Motion Picture Division, but absolutely and finally in language reflecting the vague generality of the statute, viz., that "the said film is `immoral' within the meaning of the provisions of Sections 122 and 122-a of the Education Law" (Journal of Regents meeting, Sept. 28, 1956).
The correctness of that ruling, which a bare majority of this court is about to approve, depends in the final analysis solely on whether the enforcement of sections 122 and 122-a (subd. 1) satisfies constitutional due process.
When the Regents relied on the term "immoral" and the phrase "tend to corrupt morals", as used in section 122, as authority for banning the motion picture film La Ronde, the Supreme Court reversed, without opinion (Matter of Commercial Pictures Corp. v. Board of Regents, 305 N.Y. 336, revd. 346 U. S. 587), at the same time it decided Superior Films v. Department of Educ. of Ohio (346 U. S. 587), both on authority of Joseph Burstyn, Inc., v. Wilson (343 U. S. 495) which had sustained a prior attack on section 122 as being too vague and indefinite to satisfy constitutional safeguards by providing essential criteria and standards for the guidance of administrative discretion. To meet the consequential effect of that adverse ruling section 122-a of the Education Law (L. 1954, ch. 620) was enacted in an effort to more precisely define the term "immoral" and the phrase "tend to corrupt morals" as used in section 122 for the purpose of censorship as denoting "a motion picture film or part thereof, the dominant purpose *371 or effect of which is erotic or pornographic or which portrays acts of sexual immorality, perversion, or lewdness, or which expressly or impliedly presents such acts as desirable, acceptable or proper patterns of behavior" (Education Law, § 122-a, subd. 1; emphasis supplied).
However well intentioned, the language as used still falls short of providing fundamental standards deemed essential for the guidance of administrative discretion. The added words are no more meaningful than the term "sacrilegious", "immoral", "tend to incite to crime", "prejudicial to the best interests", "harmful and indecent", all found too general and unprecise to meet constitutional standards (Joseph Burstyn, Inc., v. Wilson, supra; Matter of Commercial Pictures v. Board of Regents, supra; Winters v. New York, 333 U. S. 507; Gelling v. Texas, 343 U. S. 960; Superior Films v. Department of Educ. of Ohio, 346 U. S. 587, supra; Matter of Excelsior Pictures Corp. v. Regents, 3 N Y 2d 237; Holmby Prods. v. Vaughn, 350 U. S. 870; Hallmark Prods. v. Carroll, 384 Pa. 348). The term "immoral" as used in section 122 has not been clarified by the amendment. It is still vague and indefinite. When the censor relies on the term "immoral" as a basis for prior restraint, he necessarily must resort to his own notion of its meaning since the statute itself provides no test or standards to guide him in the exercise of his discretion. As the learned Justice, writing for the court below, succinctly pointed out: "A statute which leaves any field open to the opinion, discretion or individual point of view of a censor in barring a moving picture violates the Fourteenth Amendment".
No one contends that the film in question is obscene within the narrow legal limits of obscenity as recently defined by the Supreme Court in the application of which that court has said it is vital "that the standards for judging obscenity safeguard the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest" (Roth v. United States, 354 U. S. 476, 488; Matter of Excelsior Pictures Corp. v. Regents, 3 N Y 2d 237, supra; Holmby Prods. v. Vaughn, 350 U. S. 870, supra). This film is not being banned because of the manner in which the sequences are produced or because of any existing clear and present danger  elements which must be proven before prior *372 restraint or subsequent punishment may be justified (Dennis v. United States, 341 U. S. 494; Marsh v. Alabama, 326 U. S. 501; Thomas v. Collins, 323 U. S. 516; Thornhill v. Alabama, 310 U. S. 88; De Jonge v. Oregon, 299 U. S. 353; Stromberg v. California, 283 U. S. 359). The Regents have banned a showing of this film in its entirety because, in their opinion, its theme is contra bonos mores, and this in the face of the circumstance, that the book, on which it is based, has long been published and circulated freely without benefit of administrative censorship. This they may not do. Since Burstyn and Commercial Pictures (supra), the essential particulars of section 122 have been deemed too vague and too indefinite to satisfy fundamental essentials of statutory validity, and these deficiencies have not been cured or supplied by anything contained in subdivision 1 of section 122-a. As I read it, the statute, as amended, continues to impinge on the constitutional guarantee afforded free speech and communication by the First and Fourteenth Amendments to the Federal Constitution.
A motion picture film should not be singled out as a subject for prior restraint under the beneficent guise of regulating community mores, any more than the prior censorship of press, books, the theatre or other media of communication which, as we know, includes a motion picture. Censorship under such guise is a type of paternalism that lends itself to the whim and caprice of the administrator. Whenever tested, censorship of motion picture film in advance has been disapproved. All but six States in the Union either do not have any film censorship in advance or have discontinued such practice. It should be noted that discontinuance of administrative censorship of motion picture film in advance is not likely to create a vacuum for carte blanche exhibition of indecent films, so long as we have on our statute books appropriate penal laws to deal with the suppression of legally offensive motion picture film and the punishment of its exhibitors (cf. Penal Law, §§ 1141, 1141-a; Code Crim. Pro., § 22-a; Brown v. Kingsley Books, 1 N Y 2d 177, affd. 354 U. S. 436).
For these reasons and for the reasons so well stated by Judge FULD with which I agree, I vote to affirm the judgment appealed from, with costs.
*373 FULD, J. (dissenting).
In my opinion, an affirmance is compelled not only on the ground that the term, "immoral," as defined in the Education Law, lacks that precision of meaning demanded by the Due Process Clause (see, e.g., Commercial Pictures Corp. v. Regents, 346 U. S. 587, revg. 305 N.Y. 336; Times Film Corp. v. City of Chicago, 355 U. S. 35, revg. 244 F.2d 432), but also for the reason that the film, "Lady Chatterley's Lover"  based on "a novel of great fame by an eminent author" (per DESMOND, J, concurring, p. 367)  is not of a character which the First Amendment permits a state to exclude from public view. I agree, therefore, with what Judge DYE has said, but I would add these further thoughts on the more basic issue presented.
I cannot accept the premise underlying the opinions written for reversal on behalf of the majority, in other respects conflicting, that there is no meaningful distinction, so far as the doctrine of prior restraint is concerned, between a case involving post-publication prosecution and one involving prior administrative censorship. As I read the cases decided by the Supreme Court of the United States, legislation aimed at preventing the exhibition of moving pictures without advance approval by an administrative body, constituting as it does the clearest sort of previous restraint, is to be sharply differentiated from a statute providing for prosecution after publication. (Compare Roth v. United States, 354 U. S. 476 [per BRENNAN, J.], pp. 494-495 [per WARREN, Ch. J., concurring], with Joseph Burstyn, Inc., v. Wilson, 343 U. S. 495; Holmby Prods. v. Vaughn, 350 U. S. 870; Times Film Corp. v. City of Chicago, 355 U. S. 35, supra.)
In reaching the conclusion that a system of prior administrative censorship is unconstitutional, I have in mind that even the limited injunctive process, with provision for prompt trial by the court, was recently regarded by four justices of the Supreme Court as an impermissible prior restraint. (See Kingsley Books v. Brown, 354 U. S. 436, 445-447.) Indeed, the majority of the court as well, after noting that "`the protection * * * as to previous restraint is not absolutely unlimited'", went on, significantly, to say, "the limitation is the exception; it is to be closely confined so as to preclude what may fairly be deemed licensing or censorship" (354 U. S., at p. 441). *374 The latter is precisely what is here involved and the fact that a social problem is presented, which calls for solution, does not justify resort to unconstitutional means. As Chief Justice WARREN wrote, in the course of his concurring opinion in Roth v. United States (354 U. S. 476, 495, supra), "To recognize the existence of a problem, however, does not require that we sustain any and all measures adopted to meet that problem."
Were we dealing with newspapers or books or with a stage play, there could be no question as to the unconstitutionality of the statute under consideration, and I perceive no basis for distinguishing between such forms of expression and a moving picture. The Constitution protects all expression and is limited neither by the thoughts put forth nor by the medium employed. It protects the transmission of ideas and beliefs, whether orthodox or unorthodox, popular or unpopular, and its protection extends alike to words uttered in the street, a public hall or a theatre (with actors live or on a screen) and to words written in newspapers, books or motion picture subtitles. A belief does not lose its character as a belief, an idea does not become less of an idea, because, instead of being expressed by the airborne voice, the printed word or the still picture, it is put forward by a moving picture with a sound track. The First Amendment does not inquire whether the medium is visual, acoustic, electronic or one yet to be devised, nor does it seek to know the speed of dissemination or the size of the audience. In short, the Amendment's meaning and vitality may not be conditioned upon the mechanism involved, and the differences existing between a book and a moving picture do not support a holding that the freedom of expression assured by the Constitution is inapplicable to the moving picture.
I would, therefore, affirm the Appellate Division's order.
VAN VOORHIS, J. (dissenting).
I agree with the Appellate Division and with my dissenting brethren that section 122-a of the Education Law is unconstitutional, in which event this problem play cannot be suppressed as "immoral". On the other hand, it would have been within the jurisdiction of the Regents (it seems to me) to have eliminated several passages in this picture as "obscene" under section 122. The Motion Picture Division of the Education Department attempted something *375 of that sort in recommending that certain scenes be expurgated, but on the ground that they are "immoral". Although that ground is not available, and it is impossible to write off this entire drama as "mere pornography" (Roth v. United States, 354 U. S. 476), certain passages might have been eliminated as "obscene" without doing violence to constitutional liberties. In their endeavor to censor morality, both the Motion Picture Division and the Regents seem to have overlooked their power to exclude "obscenity", which includes the portrayal on the public screen of sexual intimacies whether they be marital or extramarital. Thus, while concurring with the dissenting Judges to affirm the unconstitutionality of section 122-a, I would remit the matter to the Board of Regents to consider the aspect which I have mentioned before ordering them to issue a license for the exhibition of this picture without any expurgations.
Order reversed, etc.