**GROVE PRESS, INC. and Readers' Subscription, Inc., Plaintiffs,**

**v.**

**Robert K. CHRISTENBERRY, individually and as Postmaster of the City of New York, Defendant.**

United States District Court
S. D. New York.
July 21, 1959.

Levine, Rembar & Zolotar, New York City, for plaintiff Grove Press, Inc. Charles Rembar, New York City, Morton E. Yohalem, Sigmund Timberg, Washington, D. C., of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff Readers' Subscription, Inc. Jay H. Topkis, New York City, of counsel.

S. Hazard Gillespie, Jr., U. S. Atty., for Southern Dist. of New York, New York City, for defendant. Robert J. Ward, New York City, John W. Hasson, Woodside, N. Y., Robert L. Tofel, Asst. U. S. Attys., New York City, of counsel.

Dickstein, Shapiro & Galligan, New York City, for New York Civil Liberties Union as amicus curiae in support of plaintiffs. Sidney Dickstein, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

These two actions against the Postmaster of New York, now consolidated, arise out of the denial of the United States mails to the recently published Grove Press unexpurgated edition of "Lady Chatterley's Lover" by D. H. Lawrence.

Plaintiffs seek to restrain the Postmaster from enforcing a decision of the Post Office Department that the unexpurgated "Lady Chatterley's Lover", and circulars announcing its availability, are non-mailable under the statute barring obscene matter from the mails (18 U.S.

C. § 1461).[1] They also seek a declaratory judgment to the effect (1) that the novel is not "obscene, lewd, lascivious, indecent or filthy" in content or character, and is not non-mailable under the statute or, in the alternative, (2) that if the novel be held to fall within the purview of the statute, the statute is to that extent invalid and violates plaintiffs' rights in contravention of the First and Fifth Amendments.

Grove Press, Inc., one of the plaintiffs, is the publisher of the book. Readers' Subscription, Inc., the other plaintiff, is a book club which has rights to distribute it.

■ Defendant has moved and plaintiffs have cross-moved for summary judgment, pursuant to Rule 56, F.R.Civ.P., 28 U.S.C. There are no disputed issues of fact. The cases are before me for final determination on the pleadings, the decision of the Postmaster General, the record before him and supplemental affidavits.[2]

On April 30, 1959 the New York Postmaster withheld from dispatch some 20,000 copies of circulars deposited for mailing by Readers' Subscription, which announced the availability of the new Grove edition of Lady Chatterley. At about the same time he also detained a number of copies of the book which had been deposited for mailing by Grove Press.

■ On May 8, 1959 letters of complaint issued by the General Counsel of the Post Office Department were served on Grove and Readers' Subscription alleging that there was probable cause to believe that these mailings violated 18 U.S.C. § 1461, and advising them of a departmental hearing. The respondents filed answers denying these allegations and a hearing was held before the Judicial Officer of the Post Office Department on May 14, 1959.[3]

The General Counsel, as complainant, introduced the Grove edition and the circulars which had been detained and rested.

The respondents offered (1) testimony as to their reputation and standing in the book publishing and distribution fields and their purpose in publishing and distributing the novel; (2) reviews of the book in leading newspapers and literary periodicals throughout the country; (3) copies of editorials and comments in leading newspapers concerning publication of the book and its anticipated impact; (4) news articles dealing with the banning of the book by the Post Office; and (5) expert testimony by two leading literary critics, Malcolm Cowley and Alfred Kazin, as to the literary stature of the work and its author, contemporary acceptance of literature dealing with sex and sex relations and their own opinions as to the effect of the book on its readers. The editorials and comments and the news articles were excluded.

The Judicial Officer before whom the hearing was held did not decide the issues. On May 28 he issued an order referring the proceedings to the Post-

---

1. The relevant portions of § 1461 provide:
 "Every obscene, lewd, lascivious, indecent, filthy or vile article * * * and
 "Every written or printed * * * circular, * * * or notice of any kind giving information * * * where, or how, or from whom * * * any of such * * * articles * * * may be obtained * * *
 "Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier."
 The statute provides penalties for violation of up to five years imprisonment and a maximum fine of $5,000 for a first offense and up to ten years' imprisonment and a maximum $10,000 fine for subsequent offenses.

2. Plaintiffs originally moved for a preliminary injunction but that motion is moot in the present posture of the case.

3. The Judicial Officer heard the case pursuant to a stipulation between the parties which had the effect of obviating the requirement that the case be heard by an independent Hearing Examiner. See *Borg-Johnson Electronics, Inc. v. Christenberry*, D.C.S.D.N.Y., 169 F.Supp. 746.

master General "for final departmental decision." [4]

On June 11, 1959 the Postmaster General rendered a departmental decision finding that the Grove edition "is obscene and non-mailable pursuant to 18 U.S.Code § 1461," and that the Readers' Subscription circulars "give information where obscene material, namely, the book in issue in this case, may be obtained and are non-mailable * * *."

This litigation, which had been commenced prior to the decision, was then brought on for hearing.

## I

The basic question here is whether the unexpurgated "Lady Chatterley's Lover" is obscene within the meaning of 18 U.S. C. § 1461,[5] and is thus excluded from the protections afforded freedom of speech and the press by the First Amendment.

However, the defendant takes the position that this question is not before me for decision. He urges that the determination by the Postmaster General that this novel is obscene and non-mailable is conclusive upon the court unless it is found to be unsupported by substantial evidence and is clearly wrong. He argues, therefore, that I may not determine the issue of obscenity *de novo*.

Thus, an initial question is raised as to the scope of the court's power of review. In the light of the issues presented, the basis of the Postmaster General's decision, and the record before him, this question is not of substance.

(1) Prior to Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, the Supreme Court had "always assumed that obscenity is not protected by the freedoms of speech and press." However, until then the constitutional question had not been directly passed upon by the court. In Roth the question was squarely posed.

The court held, in accord with its long-standing assumption, that "obscenity is not within the area of constitutionally protected speech or press." [6]

The court was faced with a dilemma. On the one hand it was required to eschew any impingement upon the cherished freedoms of speech and the press guaranteed by the Constitution and so essential to a free society. On the other hand it was faced with the recognized social evil presented by the purveyance of pornography.

The opinion of Mr. Justice Brennan for the majority makes it plain that the area which can be excluded from constitutional protection without impinging upon the free speech and free press guarantees is narrowly limited. He says (354 U.S. at page 484, 77 S.Ct. at page 1309):

4. This referral was made pursuant to paragraph III (b) 23 F.R. 2817, which provides certain "Decisions and orders of the Judicial Officer * * * shall be the final departmental decision * * * except that the Judicial Officer may refer any proceeding to * * * the Postmaster General * * * for final decision." The order of the Judicial Officer making the referral said:

"The complainant alleges that the book 'Lady Chatterley's Lover' is obscene and nonmailable under 18 U.S.C. 1461 and that the circular of Readers' Subscription, Inc. gives information as to where obscenity may be obtained. The complainant admits that the novel has literary merit but claims that the obscene passages outweigh the literary merit.

"The book at issue, which is the unexpurgated version has for many years been held to be nonmailable by the Post Office Department and non-importable by the Bureau of Customs of the Department of the Treasury. To hold the book to be mailable matter would require a reversal of rulings of long standing by this Department and to cast doubt on the rulings of a coordinate executive department."

5. I use the word "obscene" as covering the words "obscene, lewd, lascivious, indecent, filthy or vile" as used in the statute in so far as they may be applicable to this book.

6. The court expressly limited its grant of certiorari to constitutional questions concerning the validity of Section 1461 on its face, and thus was not concerned with the specific facts of the case. Roth v. United States, 352 U.S. 964, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 319.

"All ideas having even the slightest redeeming social importance— unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guarantees, unless excludable because they encroach upon the limited area of more important interests."

He gives stern warning that no publication advancing such ideas can be suppressed under the guise of regulation of public morals or censorship of public reading matter. As he says (354 U.S. at page 488, 77 S.Ct. at page 1311):

"The fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests."

It was against the background of these constitutional requirements that the Court laid down general standards for judging obscenity, recognizing that it was "vital that [such] standards * * * safeguard the protection of freedom of speech and press for material which does not treat sex" in an obscene manner. The standards were "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."

The Court did not attempt to apply these standards to a specific set of facts. It merely circumscribed and limited the excluded area in general terms.

Plainly application of these standards to specific material may involve no little

difficulty as the court was well aware. Cases involving "hard core" pornography, or what Judge Woolsey referred to as "dirt for dirt's sake," [7] purveyed furtively by dealers in smut, are relatively simple. But works of literary merit present quite a different problem, and one which the majority in Roth did not reach as such.[8]

Chief Justice Warren, concurring in the result, said of this problem (354 U. S. at page 476, 77 S.Ct. at page 1314):

"* * * The history of the application of laws designed to suppress the obscene demonstrates convincingly that the power of government can be invoked under them against great art or literature, scientific treatises, or works exciting social controversy. Mistakes of the past prove that there is a strong countervailing interest to be considered in the freedoms guaranteed by the First and Fourteenth Amendments."

And Mr. Justice Harlan, dissenting, also deeply concerned, had this to say (354 U. S. at pages 497, 498, 77 S.Ct. at page 1315):

"* * * The suppression of a particular writing or other tangible form of expression is * * * an *individual* matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether the attacked expression is suppressible within constitutional standards. Since those standards do not readily lend themselves to generalized definitions, the constitutional problem in the last analysis becomes one of particularized judgments which appellate courts must make for themselves.

"I do not think that reviewing courts can escape this responsibility

7. United States v. One Book Called "Ulysses", D.C.S.D.N.Y., 5 F.Supp. 182, 184, affirmed, 2 Cir., 72 F.2d 705.

8. "No issue is presented * * * concerning the obscenity of the material involved." Footnote 8, 354 U.S. at page 481, 77 S.Ct. at page 1307.

by saying that the trier of the facts, be it a jury or a judge, has labeled the questioned matter as 'obscene,' for, if 'obscenity' is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind."

Mr. Justice Frankfurter, concurring in Kingsley International Pictures Corp. v. Regents, 79 S.Ct. 1362, 1369 expressed a similar view. He pointed out that in determining whether particular works are entitled to the constitutional protections of freedom of expression "We cannot escape such instance-by-instance, case-by-case * * * [constitutional adjudication] in all the variety of situations that come before this Court." And Mr. Justice Harlan, in the same case, also concurring in the result, speaks of "the necessity for individualized adjudication. In the very nature of things the problems in this area are ones of individual cases * * *."

These views are not inconsistent with the decisions of the majority determining both Roth and Kingsley upon broader constitutional grounds.

It would seem that the Court itself made such "individualized" or "case by case" adjudications as to the obscenity of specific material in at least two cases following Roth. In One, Inc. v. Olesen, 355 U.S. 371, 78 S.Ct. 364, 2 L.Ed.2d 352 and Sunshine Book Co. v. Summerfield, 355 U.S. 372, 78 S.Ct. 365, 2 L. Ed.2d 352, the courts below had found in no uncertain terms that the material was obscene within the meaning of Section 1461.[9] In each case the Supreme Court in a one sentence per curiam opinion granted certiorari and reversed on the authority of Roth.

One, Inc. v. Olesen, and Sunshine Book Co. v. Summerfield, involved determina-

tions by the Post Office barring material from the mails on the ground that it was obscene. In both the District Court had found that the publication was obscene and that the determination of the Post Office should be upheld. In both the Court of Appeals had affirmed the findings of the District Court.

Yet in each the Supreme Court, without discussion, summarily reversed on the authority of Roth. As Judge Desmond of the New York Court of Appeals said of these cases—"Presumably, the court having looked at those books simply held them not to be obscene." [10]

█ It is no less the duty of this court in the case at bar to scrutinize the book with great care and to determine for itself whether it is within the constitutional protections afforded by the First Amendment, or whether it may be excluded from those protections because it is obscene under the Roth tests.

(2) Such review is quite consistent with the Administrative Procedure Act (5 U.S.C.A. § 1001 et seq.), assuming that the act is applicable here.

This is not a case where the agency determination under review is dependent on "a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." See Universal Camera Corp. v. National Labor Board, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456. Cf. O'Leary v. Brown-Pacific-Maxon, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483; Gooding v. Willard, 2 Cir., 209 F. 2d 913.

There were no disputed facts before the Postmaster General. The facts as to the mailings and the detainer were stipulated and the only issue before him was whether "Lady Chatterley's Lover" was obscene.

The complainant relied on the text of the novel and nothing more to establish obscenity. Respondents' evidence was

9. One, Inc. v. Olesen, 9 Cir., 241 F.2d 772; Sunshine Book Co. v. Summerfield, D.C.D.C., 128 F.Supp. 564; 101 U.S. App.D.C. 358, 249 F.2d 114.

10. Concurring in Kingsley Intern., Pictures Corp. v. Regents, 4 N.Y.2d 349, 368, 175 N.Y.S.2d 39, 54, 151 N.E.2d 197.

wholly uncontradicted, and, except for the opinions of the critics Cowley and Kazin as to the effect of the book upon its readers, it scarcely could have been. The complainant conceded that the book had literary merit. The views of the critics as to the place of the novel and its author in twentieth century English literature have not been questioned.

As the Postmaster General said, he attempted to apply to the book "the tests which, it is my understanding, the courts have established for determining questions of obscenity." Thus, all he did was to apply the statute, as he interpreted it in the light of the decisions, to the book. His interpretation and application of the statute involved questions of law, not questions of fact.

The Postmaster General has no special competence or technical knowledge on this subject which qualifies him to render an informed judgment entitled to special weight in the courts. There is no parallel here to determinations of such agencies as the Interstate Commerce Commission, the Securities and Exchange Commission, the National Labor Relations Board, the Federal Communications Commission, the Federal Power Commission, or many others on highly technical and complicated subject matter upon which they have specialized knowledge and are particularly qualified to speak.

No doubt the Postmaster General has similar qualifications on many questions involving the administration of the Post Office Department, the handling of the mails, postal rates and other matters. See Bates & Guild Co. v. Payne, 194 U. S. 106, 24 S.Ct. 595, 48 L.Ed. 894. But he has no special competence to determine what constitutes obscenity within the meaning of Section 1461, or that "contemporary community standards are not such that this book should be allowed to be transmitted in the mails" or that the literary merit of the book is outweighed by its pornographic features, as he found. Such questions involve interpretation of a statute, which also imposes criminal penalties, and its application to the allegedly offending material. The determination of such questions is peculiarly for the courts, particularly in the light of the constitutional questions implicit in each case.[11]

It has been suggested that the court cannot interfere with the order of the Postmaster General unless it finds that he abused his discretion. But it does not appear that the Postmaster General has been vested with "discretion" finally to determine whether a book is obscene within the meaning of the statute.

It is unnecessary to pass on the questions posed by the plaintiffs as to whether the Postmaster General has any power to impose prior restraints upon the mailing of matter allegedly obscene and whether the enforcement of the statute is limited to criminal proceedings, though it seems to me that these questions are not free from doubt.[12]

Assuming power in the Postmaster General to withhold obscene matter from dispatch in the mails temporarily, a grant of discretion to make a final determination as to whether a book is obscene and should be denied to the public should certainly not be inferred in the absence of a clear and direct mandate. As the Supreme Court pointed out under comparable circumstances in Hannegan

11. Professor Davis notes in Administrative Law Treatise, (1958) Vol. 4, § 30.07, "Substitution of judicial for administrative judgment is often rather clearly desirable, * * * [on questions] which (1) transcend the single field of the particular agency, (2) call for interpretation of the common law, * * * (4) are affected substantially by constitutional considerations, whether or not a constitutional issue is directly presented, * * * (6) bring into question judge-made law previously developed in the course of statutory interpretation * * *." These criteria are all present here.

12. These questions have never been decided by the Supreme Court. The sharply divided Court of Appeals for the District of Columbia Circuit, sitting en banc found that the Postmaster General had such power in Sunshine Book Co. v. Summerfield, supra, But I find the dissenting opinion persuasive.

v. Esquire, Inc., 327 U.S. 146, 151, 66 S.Ct. 456, 459, 90 L.Ed. 586, to vest such power in the Postmaster General would, in effect, give him the power of censorship and that "is so abhorrent to our traditions that a purpose to grant it should not be easily inferred."

■ No such grant of power to the Postmaster General has been called to my attention and I have found none.[13] Whatever administrative functions the Postmaster General has go no further than closing the mails to material which is obscene within the meaning of the statute. This is not an area in which the Postmaster General has any "discretion" which is entitled to be given special weight by the courts.[14]

The Administrative Procedure Act makes the reviewing court responsible for determining all relevant questions of law, for interpreting and applying all constitutional and statutory provisions and for setting aside agency action not in accordance with law. 5 U.S.C.A. § 1009. The question presented here falls within this framework.

Thus, the question presented for decision is whether "Lady Chatterley's Lover" is obscene within the meaning of the statute and thus excludable from constitutional protections. I will now consider that question.

### II

This unexpurgated edition of "Lady Chatterley's Lover" has never before been published either in the United States or England, though comparatively small editions were published by Lawrence himself in Italy and authorized for publication in France, and a number of pirated copies found their way to this country.

Grove Press is a reputable publisher with a good list which includes a number of distinguished writers and serious works. Before publishing this edition Grove consulted recognized literary critics and authorities on English literature as to the advisability of publication. All were of the view that the work was of major literary importance and should be made available to the American public.

No one is naive enough to think that Grove Press did not expect to profit from the book. Nevertheless the format and

13. Even under 39 U.S.C.A. §§ 259a and 259b, which give the Postmaster General power to withhold incoming mail from a purveyor of obscenity "upon evidence satisfactory" to him, an application to the District Court is required within twenty days for a determination, inter alia, as to whether the detention is reasonable or necessary. This is in contrast to Section 1461, included in the Criminal Code, where no such statutory scheme is provided.

14. The defendant cites language to indicate that the question of whether material is obscene is committed to agency discretion. One line of cases deals with "fraud orders". (39 U.S.C.A. § 259.) Fraud is almost always a question of fact and Section 259 provides that the Postmaster General may deny the mails "upon evidence satisfactory to him." Such cases as Gottlieb v. Schaffer, D.C.S.D.N.Y., 141 F.Supp. 7, which apply the substantial evidence test to agency findings of fact under these circumstances are clearly distinguishable. See, also, Donaldson v. Read Magazine, Inc., 333 U.S. 178, 68 S. Ct. 591, 92 L.Ed. 628.

Other cases cited deal with matters requiring expert judgment in the administration of the mails. E. g., Smith v. Hitchcock, 226 U.S. 53, 33 S.Ct. 6, 57 L.Ed. 119.

Cases cited involving obscenity while referring to "administrative discretion" considered the facts. In Glanzman v. Christenberry, D.C.S.D.N.Y.1958, 175 F.Supp. 485, Judge Dimock found the material clearly obscene. It was "unnecessary to seek support in the rule that an administrative determination must stand unless clearly wrong." In Anderson v. Patten, D.C.S.D.N.Y., 247 F. 382, the material, the subject matter and the treatment were salacious. In Roth v. Goldman, 2 Cir., 172 F.2d 788, 789 the materials had "little excuse for being beyond their provocative obscenity * * *."

Monart, Inc. v. Christenberry, D.C.S.D. N.Y., 168 F.Supp. 654, was concerned only with the power of the Post Office.

These cases do not hold that a Post Office determination of obscenity is entitled to special weight.

composition of the volume, the advertising and promotional material and the whole approach to publication, treat the book as a serious work of literature. The book is distributed through leading bookstores throughout the country. There has been no attempt by the publisher to appeal to prurience or the prurient minded.

The Grove edition has a preface by Archibald MacLeish, former Librarian of Congress, Pulitzer Prize winner, and one of this country's most distinguished poets and literary figures, giving his appraisal of the novel. There follows an introduction by Mark Schorer, Professor of English Literature at the University of California, a leading scholar of D. H. Lawrence and his work. The introduction is a critique of the novel against the background of Lawrence's life, work and philosophy. At the end of the novel there is a bibliographical note as to the circumstances under which it was written and first published. Thus, the novel is placed in a setting which emphasizes its literary qualities and its place as a significant work of a major English novelist.

Readers' Subscription has handled the book in the same vein. The relatively small number of Readers' Subscription subscribers is composed largely of people in academic, literary and scholarly fields. Its list of books includes works of high literary merit, including books by and about D. H. Lawrence.

There is nothing of "the leer of the sensualist" [15] in the promotion or methods of distribution of this book. There is no suggestion of any attempt to pander to the lewd and lascivious minded for profit. The facts are all to the contrary.

Publication met with unanimous critical approval. The book was favorably received by the literary critics of such diverse publications as the New York Times, the Chicago Tribune, the San Francisco Call Bulletin, the New York Post, the New York Herald Tribune, Harpers and Time, to mention only some.

The critics were not agreed upon their appraisal. Critical comment ranged from acclaim on the one hand to more restrained views that this was not the best of Lawrence's writing, and was dated and in parts "wooden". But as MacLeish says in the preface,

"* * * in spite of these reservations no responsible critic would deny the book a place as one of the most important works of fiction of the century, and no reader of any kind could undertake to express an opinion about the literature of the time or about the spiritual history that literature expresses without making his peace in one way or another with D. H. Lawrence and with this work."

Publication of the Grove edition was a major literary event. It was greeted by editorials in leading newspapers throughout the country unanimously approving the publication and viewing with alarm possible attempts to ban the book.

It was against this background that the New York Postmaster impounded the book and the Postmaster General barred it. The decision of the Postmaster General, in a brief four pages, relied on three cases, Roth v. United States, supra; United States v. One Book Called "Ulysses", D.C.S.D.N.Y., 5 F.Supp. 182, affirmed 2 Cir., 72 F.2d 705, and Besig v. United States, 9 Cir., 208 F.2d 142. While he quotes from Roth the Postmaster General relies principally on Besig, which was not reviewed by the Supreme Court. It may be noted that the Ninth Circuit relied heavily on Besig in One Book, Inc. v. Olesen, supra, which was summarily reversed by the Supreme Court on the authority of Roth.

He refers to the book as "currently withheld from the mails in the United States and barred from the mails by several other major nations." His only discussion of its content is as follows:

"The contemporary community standards are not such that this book

---

15. Woolsey, D. J. in United States v. One Book Called "Ulysses", supra [5 F.Supp. 183].

should be allowed to be transmitted in the mails.

"The book is replete with descriptions in minute detail of sexual acts engaged in or discussed by the book's principal characters. These descriptions utilize filthy, offensive and degrading words and terms. Any literary merit the book may have is far outweighed by the pornographic and smutty passages and words, so that the book, taken as a whole, is an obscene and filthy work.

"I therefore see no need to modify or reverse the prior rulings of this Department and the Department of the Treasury with respect to this edition of this book." [16]

This seems to be the first time since the notable opinions of Judge Woolsey and Judge Augustus Hand in United States v. One Book Called "Ulysses", supra, in 1934 that a book of comparable literary stature has come before the federal courts charged with violating the federal obscenity statutes. That case held that James Joyce's "Ulysses" which had been seized by the Customs under Section 305 of the Tariff Act of 1930, 19 U.S.C.A. § 1305, was not obscene within the meaning of that statute. It thoroughly discussed the standards to be applied in determining this question.

■ The essence of the Ulysses holding is that a work of literary merit is not obscene under federal law merely because it contains passages and lan-

guage dealing with sex in a most candid and realistic fashion and uses many four-letter Anglo-Saxon words. Where a book is written with honesty and seriousness of purpose, and the portions which might be considered obscene are relevant to the theme, it is not condemned by the statute even though "it justly may offend many." "Ulysses" contains numerous passages dealing very frankly with sex and the sex act and is free in its use of four-letter Anglo-Saxon words. Yet both Judge Woolsey in the District Court, and Judge Hand in the Court of Appeals, found that it was a sincere and honest book which was not in any sense "dirt for dirt's sake." [17] They both concluded that "Ulysses" was a work of high literary merit, written by a gifted and serious writer, which did not have the dominant effect of promoting lust or prurience and therefore did not fall within the interdiction of the statute.

Roth v. United States, supra, decided by the Supreme Court in 1957, twenty-three years later, unlike the Ulysses case, did not deal with the application of the obscenity statutes to specific material. It laid down general tests circumscribing the area in which matter is excludable from constitutional protections because it is obscene, so as to avoid impingement on First Amendment guarantees.[18]

The court distilled from the prior cases (including the Ulysses case, which it cited with approval) the standards to be applied [19]—"whether to the average

16. The "rulings" referred to, apparently made even before the Ulysses case, were not produced at the hearing and it does not appear that they have ever seen the light of day. There is nothing in the record as to their content, the grounds on which they were based, whether whatever parties may have been involved were given a hearing, or what standards were applied. Nor is there any indication as to what "major nations" have banned the book or whether in such countries there are any constitutional or other legal protections afforded speech and press.

17. As Judge Woolsey said (5 F.Supp. at page 184): "Each word of the book contributes like a bit of mosaic to the detail of the picture which Joyce is seeking to construct for his readers."

18. There was no question but that the material involved in Roth was hard core pornography and that the defendants were engaged "in the commercial exploitation of the morbid and shameful craving for materials with prurient effect." (354 U.S. at page 496, 77 S.Ct. at page 1315.)

19. For a comprehensive review of the prior material see Judge Frank's pro-

person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to purient interest."

The court saw no significant difference between this expression of the standards and those in the American Law Institute Model Penal Code [20] to the effect that

"* * * A thing is obscene if, considered as a whole, its predominant appeal is to pruient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters * * *."

These standards are not materially different from those applied in Ulysses to the literary work considered there. Since the Roth case dealt with these standards for judging obscenity in general terms and the Ulysses case dealt with application of such standards to a work of recognized literary stature, the two should be read together.

A number of factors are involved in the application of these tests.

As Mr. Justice Brennan pointed out in Roth, sex and obscenity are by no means synonymous and "[t]he portrayal of sex, e. g., in art, literature and scientific works, is not in itself sufficient reason to deny material the constitutional protection of freedom of speech and press." As he said, sex has been "a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." The subject may be discussed publicly and truthfully without previous restraint or fear of subsequent punishment as long as it does not fall within the narrowly circumscribed interdicted area.

■ Both cases held that, to be obscene, the dominant effect of the book

must be an appeal to prurient interest —that is to say, shameful or morbid interest in sex. Such a theme must so predominate as to submerge any ideas of "redeeming social importance" which the publication contains.

■ It is not the effect upon the irresponsible, the immature or the sensually minded which is controlling. The material must be judged in terms of its effect on those it is likely to reach who are conceived of as the average man of normal sensual impulses,[21] or, as Judge Woolsey says, "what the French would call l'homme moyen sensuel." [5 F.Supp. 184.]

■ The material must also exceed the limits of tolerance imposed by current standards of the community with respect to freedom of expression in matters concerning sex and sex relations. Moreover, a book is not to be judged by excerpts or individual passages but must be judged as a whole.

All of these factors must be present before a book can be held obscene and thus outside constitutional protections.

Judged by these standards, "Lady Chatterley's Lover" is not obscene. The decision of the Postmaster General that it is obscene and therefore non-mailable is contrary to law and clearly erroneous. This is emphasized when the book is considered against its background and in the light of its stature as a significant work of a distinguished English novelist.

D. H. Lawrence is one of the most important novelists writing in the English language in this century. Whether he is, as some authorities say, the greatest English novelist since Joseph Conrad, or one of a number of major figures, makes little difference. He was a writer of great gifts and of undoubted artistic integrity.

The text of this edition of "Lady Chatterley's Lover" was written by Lawrence

vocative concurring opinion in the Court of Appeals which points to problems in this field still unresolved. United States v. Roth, 2 Cir., 237 F.2d 796, 801.

20. § 207.10(2), Tent.Draft No. 6, 1957.
21. See Volanski v. United States, 6 Cir., 246 F.2d 842.

toward the close of his life and was his third version of the novel, originally called "Tenderness".

The book is almost as much a polemic as a novel.

In it Lawrence was expressing his deep and bitter dissatisfaction with what he believed were the stultifying effects of advancing industrialization and his own somewhat obscure philosophic remedy of a return to "naturalness". He attacks what he considered to be the evil effects of industrialization upon the wholesome and natural life of all classes in England. In his view this was having disastrous consequences on English society and on the English countryside. It had resulted in devitalization of the upper classes of society and debasement of the lower classes. One result, as he saw it, was the corrosion of both the emotional and physical sides of man as expressed in his sexual relationships which had become increasingly artificial and unwholesome.

The novel develops the contrasts and conflicts in characters under these influences.

The plot is relatively simple.

Constance Chatterly is married to a baronet, returned from the first world war paralyzed from the waist down. She is physically frustrated and dissatisfied with the artificiality and sterility of her life and of the society in which she moves. Her husband, immersed in himself, seeks compensation for his own frustrations in the writing of superficial and brittle fiction and in the exploitation of his coal mining properties, a symbol of the creeping industrial blight. Failing to find satisfaction in an affair with a man in her husband's circle, Constance Chatterley finds herself increasingly restless and unhappy. Her husband half-heartedly urges her to have a child by another man whom he will treat as his heir. Repelled by the suggestion that she casually beget a child,

she is drawn to Mellors, the gamekeeper, sprung from the working class who, having achieved a measure of spiritual and intellectual independence, is a prototype of Lawrence's natural man. They establish a deeply passionate and tender relationship which is described at length and in detail. At the conclusion she is pregnant and plans to obtain a divorce and marry the gamekeeper.

This plot serves as a vehicle through which Lawrence develops his basic theme of contrast between his own philosophy and the sterile and debased society which he attacks. Most of the characters are prototypes. The plot and theme are meticulously worked out with honesty and sincerity.

The book is replete with fine writing and with descriptive passages of rare beauty. There is no doubt of its literary merit.

It contains a number of passages describing sexual intercourse in great detail with complete candor and realism. Four-letter Anglo-Saxon words are used with some frequency.

These passages and this language understandably will shock the sensitive minded. Be that as it may, these passages are relevant to the plot and to the development of the characters and of their lives as Lawrence unfolds them. The language which shocks, except in a rare instance or two, is not inconsistent with character, situation or theme.

Even if it be assumed that these passages and this language taken in isolation tend to arouse shameful, morbid and lustful sexual desires in the average reader, they are an integral, and to the author a necessary [22] part of the development of theme, plot and character. The dominant theme, purpose and effect of the book as a whole is not an appeal to prurience or the prurient minded. The book is not "dirt for dirt's sake".[23] Nor

---

22. See D. H. Lawrence, "Sex Literature and Censorship," (Twayne Publishers, 1953) p. 89. Essay "A Propos of Lady Chatterley's Lover."

23. As Mr. Justice Frankfurter pointed out in Kingsley International Pictures Corp. v. Regents, supra, Lawrence "knew there was such a thing as pornog-

do these passages and this language submerge the dominant theme so as to make the book obscene even if they could be considered and found to be obscene in isolation.

What the Postmaster General seems to have done is precisely what the Supreme Court in Roth and the courts in the Ulysses case said ought not to be done. He has lifted from the novel individual passages and language, found them to be obscene in isolation and therefore condemned the book as a whole. He has disregarded the dominant theme and effect of the book and has read these passages and this language as if they were separable and could be taken out of context. Thus he has "weighed" the isolated passages which he considered obscene against the remainder of the book and concluded that the work as a whole must be condemned.

 Writing about sex is not in itself pornographic, as the Postmaster General recognized. Nor does the fact that sex is a major theme of a book condemn the book as obscene. Neither does the use of "four letter" words, despite the offense they may give. "Ulysses" was found not to be obscene despite long passages containing similar descriptions and language. As Judge Woolsey said there (5 F.Supp. at pages 183, 184):

"The words which are criticized as dirty are old Saxon words known to almost all men and, I venture, to many women, and are such words as would be naturally and habitually used, I believe, by the types of folk whose life, physical and mental, Joyce is seeking to describe."

Such words "are, almost without exception of honest Anglo-Saxon ancestry and were not invented for purely scatological effect." [24]

 The tests of obscenity are not whether the book or passages from it are in bad taste or shock or offend the sensibilities of an individual, or even of a substantial segment of the community. Nor are we concerned with whether the community would approve of Constance Chatterley's morals. The statute does not purport to regulate the morals portrayed or the ideas expressed in a novel, whether or not they are contrary to the accepted moral code, nor could it constitutionally do so. Kingsley International Pictures v. Regents, supra.

Plainly "Lady Chatterley's Lover" is offensive to the Postmaster General, and I respect his personal views. As a matter of personal opinion I disagree with him for I do not personally find the book offensive.

But the personal views of neither of us are controlling here. The standards for determining what constitutes obscenity under this statute have been laid down. These standards must be objectively applied regardless of personal predilections.

There has been much discussion of the intent and purpose of Lawrence in writing Lady Chatterley. It is suggested that the intent and purpose of the author

raphy, dirt for dirt's sake, or, to be more accurate, dirt for money's sake. This is what D. H. Lawrence wrote:

" 'But even I would censor genuine pornography, rigorously. It would not be very difficult. In the first place, genuine pornography is almost always underworld, it doesn't come into the open. In the second, you can recognize it by the insult it offers invariably, to sex, and to the human spirit.

" 'Pornography is the attempt to insult sex, to do dirt on it. This is unpardonable. Take the very lowest instance, the picture post-card sold underhand, by the underworld, in most cities. What I have seen of them have been of an ugliness to make you cry. The insult to the human body, the insult to a vital human relationship! Ugly and cheap they make the human nudity, ugly and degraded they make the sexual act, trivial and cheap and nasty.' (D. H. Lawrence, Pornography and Obscenity, p. 13.)" Collected in Lawrence "Sex Literature and Censorship", supra, p. 69 [79 S.Ct. 1367].

24. Judge Bok in Commonwealth v. Gordon, 66 Pa.Dist. & Co.R. 101, 114.

has no relevance to the question as to whether his work is obscene and must be disregarded.

■ No doubt an author may write a clearly obscene book in the mistaken belief that he is serving a high moral purpose. The fact that this is the author's purpose does not redeem the book from obscenity.

But the sincerity and honesty of purpose of an author as expressed in the manner in which a book is written and in which his theme and ideas are developed has a great deal to do with whether it is of literary and intellectual merit. Here, as in the Ulysses case, there is no question about Lawrence's honesty and sincerity of purpose, artistic integrity and lack of intention to appeal to prurient interest.

Thus, this is an honest and sincere novel of literary merit and its dominant theme and effect, taken as a whole, is not an appeal to the prurient interest of the average reader.

This would seem to end the matter. However, the Postmaster General's finding that the book is non-mailable because it offends contemporary community standards bears some discussion.

I am unable to ascertain upon what the Postmaster General based this conclusion. The record before him indicates general acceptance of the book throughout the country and nothing was shown to the contrary. The critics were unanimous. Editorial comment by leading journals of opinion welcomed the publication and decried any attempts to ban it.

■ It is true that the editorial comment was excluded by the Judicial Officer at the hearing. But it seems to me that this was error. These expressions were relevant and material on the question of whether the book exceeded the limits of freedom of expression in matters involving sex and sex relations tolerated by the community at large in these times.

The contemporary standards of the community and the limits of its tolerance cannot be measured or ascertained accurately. There is no poll available to determine such questions. Surely expressions by leading newspapers, with circulations of millions, are some evidence at least as to what the limits of tolerance by present day community standards are, if we must embark upon a journey of exploration into such uncharted territory.

Quite apart from this, the broadening of freedom of expression and of the frankness with which sex and sex relations are dealt with at the present time require no discussion. In one best selling novel after another frank descriptions of the sex act and "four-letter" words appear with frequency. These trends appear in all media of public expression, in the kind of language used and the subjects discussed in polite society, in pictures, advertisements and dress, and in other ways familiar to all. Much of what is now accepted would have shocked the community to the core a generation ago. Today such things are generally tolerated whether we approve or not.

■ I hold that, at this stage in the development of our society, this major English novel, does not exceed the outer limits of the tolerance which the community as a whole gives to writing about sex and sex relations.

One final word about the constitutional problem implicit here.

It is essential to the maintenance of a free society that the severest restrictions be placed upon restraints which may tend to prevent the dissemination of ideas.[25] It matters not whether such ideas be expressed in political pamphlets or works of ʝlitical, economic or social theory or criticism, or through

25. It should be noted that if the book is obscene within § 1461 and thus barred from the mails it is a crime to ship it by express or in interstate commerce generally under 18 U.S.C. §§ 1462, 1465, and it would be subject to seizure by the customs authorities if imported for sale. 19 U.S.C.A. § 1305.

artistic media. All such expressions must be freely available.

A work of literature published and distributed through normal channels by a reputable publisher stands on quite a different footing from hard core pornography furtively sold for the purpose of profiting by the titillation of the dirty minded. The courts have been deeply and properly concerned about the use of obscenity statutes to suppress great works of art or literature. As Judge Augustus Hand said in Ulysses (72 F. 2d at page 708):

"* * * The foolish judgments of Lord Eldon about one hundred years ago, proscribing the works of Byron and Southey, and the finding by the jury under a charge by Lord Denman that the publication of Shelley's 'Queen Mab' was an indictable offense are a warning to all who have to determine the limits of the field within which authors may exercise themselves."

To exclude this book from the mails on the grounds of obscenity would fashion a rule which could be applied to a substantial portion of the classics of our literature. Such a rule would be inimical to a free society. To interpret the obscenity statute so as to bar "Lady Chatterley's Lover" from the mails would render the statute unconstitutional in its application, in violation of the guarantees of freedom of speech and the press contained in the First Amendment.

It may be, as the plaintiffs urge, that if a work is found to be of literary stature, and not "hard core" pornography, it is *a fortiori* within the protections of the First Amendment. But I do not reach that question here. For I find that "Lady Chatterley's Lover" is not obscene within the meaning of 18 U.S.C. § 1461, and is entitled to the protections guaranteed to freedoms of speech and press by the First Amendment. I therefore hold that the order of the Postmaster General is illegal and void and violates plaintiffs' rights in contravention of the Constitution.

Defendant's motion for summary judgment is denied. Plaintiffs' cross-motions for summary judgment are granted. An order will issue permanently restraining the defendant from denying the mails to this book or to the circulars announcing its availability.

Settle order on notice.